# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LANICE D. CLAY**, | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00060 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security**, | ) | BY: PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Lanice D. Clay, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Clay's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) (West 2003 & Supp. 2008). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

1

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Clay protectively filed his applications for DIB and SSI on June 24, 2004, alleging disability as of May 1, 2004,[1] due to back problems, diverticulitis, nerve problems, colon and stomach problems, liver problems, left arm numbness and dizziness. (Record, ("R."), at 48-50, 53, 56, 94, 272-76.) The claims were denied initially and upon reconsideration. (R. at 31-33, 36-39, 279-81.) Clay then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on June 22, 2006, at which Clay was represented by counsel. (R. at 41, 305-31.)

By decision dated July 20, 2006, the ALJ denied Clay's claims. (R. at 14-18.) The ALJ found that Clay met the disability insured status requirements of the Act for DIB purposes through the date of his decision. (R. at 17.) The ALJ found that Clay had not engaged in substantial gainful activity since his alleged onset date. (R. at 17.) The ALJ also found that the medical evidence established that Clay had severe impairments, namely diverticulosis and borderline intellect, but he found that Clay did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ found that Clay's allegations of disabling pain and other symptoms were not credible and were not supported by

[1] This date was later amended to May 6, 2005, by Clay's counsel. (R. at 308.)

the documentary evidence. (R. at 17.) The ALJ found that Clay had the residual functional capacity to perform the full range of light work.[2] (R. at 17.) Despite finding that Clay suffered from borderline intellectual functioning, the ALJ found that Clay did not have any nonexertional limitations. (R. at 17.) The ALJ found that Clay was unable to perform any of his past relevant work. (R. at 17.) The ALJ also found that Clay was functionally illiterate and that transferability of job skills was not material to the determination of disability. (R. at 17-18.) Based on Clay's age, education, experience and residual functional capacity, the ALJ found that the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), directed a conclusion that Clay was not disabled. (R. at 17-18.) Thus, the ALJ concluded that Clay was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 18.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2008).

After the ALJ issued his decision, Clay pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-9.) Clay then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is before this court on Clay's motion for summary judgment filed April 24, 2008, and the Commissioner's motion for summary judgment filed May 15, 2008.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

*II. Facts*

Clay was born in 1969, which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). (R. at 48.)  He received a special education certificate at the end of twelfth grade and has training in auto body mechanics.  (R. at 61-62, 223.)  Clay has past work experience as a carpenter's helper and as a heat pump installer for a heating and cooling company.  (R. at 57, 311.)

Clay testified that he "went all the way through school, but it was vocational," and that he took special education classes.  (R. at 309.)  He testified, however, that he did not graduate with a diploma.  (R. at 309.)  Clay testified that he was unable to read and write with the exception of a few small words, such as cat or dog.  (R. at 310.)  Clay testified that he last worked as a carpenter's helper a few months prior to hearing, but had to leave work after becoming dizzy and almost fainting.  (R. at 310-11.)  He also testified that he had worked as a heat pump installer for about 15 years.  (R. at 312.)

Clay testified that he felt he was disabled because of an inability to get up in the mornings, bad nights, carpal tunnel syndrome, left hip bursitis, stomach problems, low blood sugar and high blood pressure.  (R. at 313-16.)  He stated that he had trouble gripping because of carpal tunnel syndrome.  (R. at 313, 315.)  He also stated that he was unable to be exposed to the sun for extended periods of time because of certain medications he took.  (R. at 316.)  He further explained some of his medications caused vomiting and diarrhea.  (R. at 317.)  He stated that he had trouble sleeping because of right hand pain and numbness.  (R. at 318.)  He stated that he could stand for only five minutes before having to sit down, but that he

could sit for extended periods as long as he was able to move around.  (R. at 318-19.)

He testified that he was seeing a mental health professional, who prescribed Wellbutrin.  (R. at 321.)  He stated that he had anxiety attacks, which caused chest pain and made him feel as if he were having a heart attack.  (R. at 321-22.)  Clay testified that he had a driver's license, but that he rarely drove.  (R. at 323.)  He stated that he attended church on Sunday mornings and would "fool around with goats and stuff at the house to have something to do."  (R. at 323-24.)

Cathy Sanders, a vocational expert, also was present and testified at Clay's hearing.  (R. at 324-30.)  Sanders classified Clay's past relevant work as a carpenter's helper and heat pump installer as heavy[3] and unskilled.  (R. at 326.)  She testified that Clay would have no transferable skills.  (R. at 326.)  Sanders was asked to consider a hypothetical individual of the same age and work history as Clay, who was functionally limited as set forth in a Physical Residual Functional Capacity Assessment, ("PRFC"), completed by Dr. Frank M. Johnson, M.D., and Dr. Randall Hays, M.D., both state agency physicians.  (R. at 326.)  Sanders testified that there would be a significant number of jobs available in the national and regional economies for such an individual.  (R. at 326.)  She testified that such an individual could perform work as a farm worker, a vehicle washer, a greenhouse worker, a nonconstruction laborer and a construction laborer.  (R. at 326-27.)

---

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If an individual can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

Sanders was next asked to assume the same hypothetical individual, but who possessed the nonexertional limitations set forth in a consultative examination performed by Kathy J. Miller, M.Ed., and Robert S. Spangler, Ed.D. (R. at 327.) She testified that such limitations would eliminate about 30 percent of the jobs previously enumerated. (R. at 327.) Lastly, Sanders testified that jobs would not be available if she were to assume that the hypothetical individual had the restrictions testified to by Clay. (R. at 328.)

In rendering his decision, the ALJ reviewed records from Stone Mountain Health Services; Norton Community Hospital; Dr. Pauline Reed, M.D.; Dickenson Community Hospital; Dr. Gerald Daiuto, M.D.; Dr. Luciano D'Amato, M.D.; Dr. Candace Bellamy, M.D.; Dr. Ravindra Murthy, M.D.; Robert S. Spangler, Ed.D., a licensed psychologist; Kathy J. Miller, M.Ed., a licensed clinical examiner; Julie Jennings, Ph.D., a state agency psychologist; Louis Perrott, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Carol Looney, FNP; and Edward E. Latham, Ph.D., a clinical psychologist. The Appeals Council also reviewed additional evidence from Dr. D'Amato and Stone Mountain Health Services.[4]

Clay presented to Dr. Pauline Reed, M.D., from October 19, 2001, until June 23, 2004. (R. at 119-41.) On October 19, 2001, Clay was seen by Dr. Reed with a chief complaint of daily heartburn. (R. at 126.) Dr. Reed diagnosed

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

6

gastroesophageal reflex disease, ("GERD"), and prescribed Prevacid.  (R. at 127.)
She also noted the possibility that Clay might have high cholesterol.  (R. at 127.)
On November 21, 2001, Dr. Reed noted that Clay's heartburn had improved, but
again diagnosed GERD.  (R. at 125.)  Clay also complained of pain when leaning
forward and when coughing.  (R. at 125.)  Dr. Reed diagnosed musculoskeletal
pain and bronchitis, and Clay was prescribed Bactrim, Bidex DM and Motrin for
his symptoms.  (R. at 125.)

On September 5, 2002, Clay reported occasional chest pain and tingling in
his arms and fingers.  (R. at 124.)  Dr. Reed noted point tenderness at the inferior
border of Clay's twelfth rib.  (R. at 124.)  Additionally, her examination revealed a
positive Tinel's sign[5] on the left hand and decreased strength in Clay's right hand.
(R. at 124.)  Dr. Reed diagnosed GERD, paresthesias and carpal tunnel syndrome.
(R. at 124.) On October 16, 2002, Dr. Reed noted possible irritable bowel
syndrome, ("IBS"), and prescribed Bentyl.  (R. at 123.)  Clay reported again on
June 6, 2003, and stated that he had not taken his Prevacid for more than 2 months.
(R. at 122.)  Dr. Reed again diagnosed GERD and noted that Clay's symptoms
were occasional when on Prevacid, but that he was now experiencing severe
heartburn.  (R. at 122.)  On August 8, 2003, Clay reported several episodes of
dizziness, light headedinesss and decreased sleep during the two weeks prior to his
visit. (R. at 121.)  He also reported congestion and tremors.  (R. at 121.)  Dr. Reed

---

[5]Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made
over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the
nerve." *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1526 (27th ed.
1988.).

diagnosed syncope and hypoglycemic episodes and advised Clay to eat small, frequent meals. (R. at 121.) She also ordered an electrocardiogram, ("EKG"), a glucose tolerance test and orthostatic blood pressure readings. (R. at 121.) Clay again presented to Dr. Reed on September 5, 2003, with chief complaints of sleep difficulty and heartburn. (R. at 120.) Dr. Reed diagnosed GERD and insomnia. (R. at 120.) She prescribed Sonata and Prevacid and instructed Clay to call if his symptoms worsened. (R. at 120.)

Clay presented to Dickenson Community Hospital on May 23, 2004, with abdominal pain that had persisted for nine days. (R. at 146.) A computerized tomography scan, ("CT scan"), of the abdomen and pelvis revealed inflammatory changes in the left abdomen extending down to the level of the upper pelvis and in the area around the mid and distal descending colon. (R. at 149.) The radiologist noted that these findings were most likely indicative of diverticulitis. (R. at 149.) A small left renal calculus, or kidney stone, was noted. (R. at 150.) Dr. Gerald Daiuto, M.D., diagnosed Clay with diverticulitis, prescribed Flagyl, Cipro and Percocet and ordered Clay to eat a low residue diet. (R. at 142-43.)

On May 25, 2004, Clay reported to Dr. Luciano D'Amato, M.D., for a follow-up regarding his left lower quadrant pain. (R. at 160.) Dr. D'Amato noted mild left lower quadrant tenderness, but no rebound. (R. at 159.) He advised Clay to continue on his antibiotics and return in seven to 10 days if his symptoms did not improve. (R. at 159.) A message dated June 2, 2004, indicated that Clay had returned to work and was no longer experiencing symptoms. (R. at 159.) Clay returned to Dr. D'Amato on June 10, 2004, and reported a return of pain in his left

lower quadrant and left back.  (R. at 158.)  Dr. D'Amato ordered a colonoscopy.
(R. at 158.)

On June 23, 2004, Clay returned to Dr. Reed's office and reported left-sided back pain.  (R. at 119.)  He informed Dr. Reed that he had been diagnosed with diverticulitis about a month prior to his visit, and that his previous flank pain had now become lower back pain.  (R. at 119.)  Clay was diagnosed with diverticulitis, lumbar pain and renal calculi.  (R. at 119.)  Dr. Reed prescribed Cipro and ordered abdominal x-rays, a urine culture and blood tests.  (R. at 119.)  On June 24, 2004, an imaging report from Norton Community Hospital, ("NCH"), indicated findings suggestive of a small left renal calculus and an unremarkable bowel gas pattern. (R. at 139.)  On that same date, another imaging report revealed mild degenerative changes in Clay's back, normal disc spaces and a small faint density overlying the left twelfth rib, which possibly represented a small renal calculus.  (R. at 138.)

Clay underwent a colonoscopy at NCH on July 19, 2004.  (R. at 151.)  The colonoscopy revealed diverticulosis in the sigmoid and descending colon.  (R. at 151.)  Clay presented to Stone Mountain Health Services, ("SMHS"), on August 9, 2004, with a chief complaint of stomach problems.  (R. at 172.)  He informed Dr. Candace Bellamy, M.D., that he was told his stomach problems were stress-related. (R. at 172.)  Clay explained to Dr. Bellamy that he had been stressed out at work and that his wife told him he was more irritable.  (R. at 172.)  An examination revealed epigastric tenderness, and Clay was diagnosed with epigastric pain and anxiety. (R. at 172.)  Dr. Bellamy prescribed Effexor and was referred to a psychiatrist.  (R. at 171-72.)

9

Clay returned to SMHS on August 27, 2004, to follow up on blood work which revealed a high liver enzyme count. (R. at 170.) Dr. Bellamy noted a history of alcohol abuse, but she also noted that Clay reported no alcohol use in several years. (R. at 170.) Clay did report cocaine use a few years prior to his visit. (R. at 170.) Clay complained of abdominal pain and informed Dr. Bellamy that he would prefer to see Dr. D'Amato for his stomach problems. (R. at 170.) SMHS called Dr. D'Amato's office, and Clay was seen by Dr. D'Amato on that same day. (R. at 156, 170.) At Dr. D'Amato's office, Clay complained of recurrent left quadrant pain, and he was prescribed Vibramycin.[6] (R. at 156.) On September 3, 2004, an upper abdomen sonogram ordered by Dr. D'Amato, revealed no acute sonographic abnormality. (R. at 165.) Clay returned to Dr. D'Amato on October 26, 2004, with complaints of pain in his epigastric area and bloating and pain in the abdomen. (R. at 154.) Dr. D'Amato diagnosed peptic ulcer disease, and Clay was prescribed Levsin. (R. at 154.)

After being referred by Dr. D'Amato, Clay presented to Dr. Ravindra Murthy, M.D., on September 16, 2004. (R. at 183-86.) Clay reported intermittent episodes of chest pain, which he attributed to stress. (R. at 184.) He also reported diverticulitis, intermittent diarrhea, abdominal cramping and chronic heartburn. (R. at 183-84.) Dr. Murthy noted abnormal liver tests and opined that Clay most likely had fatty liver disease. (R. at 183-85.) Clay returned to Dr. Murthy for a follow-up appointment on December 7, 2004. (R. at 181.) Dr. Murthy reported that Clay remained stable with regard to his liver problem. (R. at 181.)

---

[6] Dr. D'Amato's treatment notes are mostly illegible.

10

Robert S. Spangler, Ed.D., a licensed psychologist, and Kathy J. Miller, M.Ed., a licensed psychological examiner, examined Clay on September 23, 2004, and completed a psychology report at the request of the Virginia Department of Rehabilitative Services. (R. at 188-93.) Spangler and Miller noted that school records confirmed that Clay attended special education classes, and that he consistently failed the Virginia Minimum Competency Test. (R. at 189.) They reported that Clay appeared to be emotionally stable, but that he reported consistent panic attacks in public. (R. at 190.) They found that Clay was capable of handling his own financial affairs. (R. at 191.) Spangler and Miller administered the Wechsler Adult Intelligence Scale – Third Edition, ("WAIS-III"), and Clay obtained a verbal intelligence quotient, ("IQ"), score of 72, a performance IQ score of 84 and a full-scale IQ score of 86, which placed him in the borderline range of current intellectual functioning. (R. at 186.) Clay's reading achievement was assessed at the second-grade level, his arithmetic achievement was assessed at the third-grade level, and he was found to be functionally illiterate. (R. at 191.) Spangler and Miller diagnosed mild panic disorder with agoraphobia and borderline intellectual functioning, and they assessed Clay's Global Assessment of Functioning, ("GAF"), score at 55.[7] (R. at 192.) Spangler and Miller found that Clay's ability to understand was limited by his functional

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. . . ." DSM-IV at 32.

Case 2:07-cv-00060-JPJ   Document 18   Filed 08/13/08   Page 11 of 27   Pageid#: 68

illiteracy, his ability to sustain concentration and persistence was limited by panic disorder with agoraphobia and his adaptation was limited by functional illiteracy. (R. at 192.)

Julie Jennings, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on October 25, 2004. (R. at 194-97.) Jennings found that Clay was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods, to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. (R. at 194-97.) Jennings noted that with borderline IQ scores and treatment for anxiety and depression, Clay would be restricted to simple, unskilled, nonstressful work. (R. at 196.) She found his allegations of symptoms to be partially credible. (R. at 196.)

Jennings also completed a Psychiatric Review Technique form, ("PRTF"), and found that Clay suffered from an affective disorder, an anxiety-related disorder and mental retardation. (R. at 198-210.) Jennings found that Clay had a moderate restriction in his activities of daily living, had moderate difficulties in maintaining

12

social functioning and that he had moderate difficulties in maintaining concentration, persistence or pace. (R. at 208.) Jennings again stated that Clay appeared to be capable of performing simple work. (R. at 210.) Louis Perrott, Ph.D., another state agency psychologist, reviewed and affirmed Jennings's findings on February 18, 2005. (R. at 198.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a PRFC on October 28, 2004. (R. at 211-16.) Dr. Johnson found that Clay had the residual functional capacity to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of six hours in a typical eight-hour workday and sit for a total of about six hours in a typical eight-hour workday. (R. at 212.) He also found that Clay had an unlimited ability to push and/or pull, but that he would never be able to climb a ladder, rope or scaffold. (R. at 212-13.) Dr. Johnson fund that Clay could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 213.) Dr. Johnson imposed no manipulative, visual, communicative or environmental limitations. (R. at 213-14.) He noted that Clay's allegations were partially credible and that he appeared to be able to perform light work. (R. at 216.) Dr. Randall Hays, M.D., another state agency physician, reviewed and affirmed Dr. Johnson's findings on February 22, 2005. (R. at 216.)

Clay returned to SMHS on January 7, 2005, and he was seen by Carol Looney, FNP. (R. at 168-69.) Looney noted Clay's problems with diverticulitis, heartburn, indigestion and depression. (R. at 169.) She diagnosed diverticulitis, generalized abdominal pain, GERD, IBS and malaise. (R. at 169.) Looney

13

requested several laboratory tests and prescribed Protonix, Bentyl and Wellbutrin XL. (R. at 168.) On February 5, 2005, Clay presented to the Dickenson Community Hospital emergency room, ("ER"), with complaints of pain in his right leg and foot which had persisted for about a week. (R. at 220.) He was diagnosed with a right calf strain. (R. at 218.) An imaging report from NCH on that same date revealed no sonographic evidence of deep vein thrombosis. (R. at 222.) Clay returned to SMHS again on February 7, 2005, and informed Looney that he went to the ER for what he believed to be a blood clot. (R. at 166.) Clay explained to Looney that he was informed by healthcare professionals at the ER that he had either arthritis or a pulled muscle. (R. at 166.) Clay stated that he was doing better, but that he had a lot of trouble with joint pain. (R. at 166.) Looney diagnosed polyarthralgias and prescribed Mobic. (R. at 166.) On May 24, 2005, Looney diagnosed hypertension after Clay reported blurred vision and headaches, and tests revealed elevated blood pressure. (R. at 245.) Looney prescribed Lisinopril and advised Clay concerning his diet. (R. at 245.)

Clay returned on June 3, 2005, for a follow-up regarding his high blood pressure and for pain in his hands. (R. at 243.) Looney ordered an arthritis panel, which came back negative for rheumatoid arthritis. (R. at 243.) She discontinued Lisinopril and Mobic and prescribed Cozaar and Relafen. (R. at 243.) On June 17, 2005, he reported that he was "doing fine on Cozaar" and that Relafen seemed to be helping with his arthritis. (R. at 241.) Clay was diagnosed with hypertension and GERD. (R. at 241.) Looney noted the he had an elevated liver function test and that he needed hyperlipidemia screening. (R. at 241.)

14

On October 10, 2005, Edward E. Latham, Ph.D., a clinical psychologist, completed a psychological evaluation of Clay. (R. at 223-26.) Latham reported that Clay's overall intellectual functioning was below average based on prior intellectual assessments, and Latham reported that Clay's basic educational skills were deficient based on observations during the interview and a report of formal assessment in the record. (R. at 225.) He noted that Clay appeared to have an emotional disturbance and diagnosed depressive disorder, not otherwise specified, ("NOS"), and anxiety disorder, NOS. (R. at 225.) Latham concluded that Clay was able to understand, retain and follow simple instructions and to complete routine, repetitive tasks of a simple nature. (R. at 225.) He also found that Clay's attention/concentration abilities were sufficient for simple tasks, that he was mildly impaired in his ability to relate interpersonally and that he was mildly to moderately impaired in his ability to adapt to stressors. (R. at 225.)

Latham also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 227-30.) He indicated that Clay had a slight impairment in his ability to understand, remember and carry out short, simple instructions and to interact appropriately with the public, with supervisors and with co-workers. (R. at 227-28.) Latham also indicated that Clay had a moderate limitation in his ability to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 227-28.)

15

A CT scan report dated October 17, 2005, revealed chronic diverticular disease without evidence of diverticulitis. (R. at 251.) On December 16, 2005, Looney noted that Clay's depression seemed to be well-controlled with Wellbutrin. (R. at 236.) Looney also indicated that Clay's blood pressure had been stable. (R. at 236.) On that date, Clay complained of headaches and left hip pain. (R. at 236.) An examination revealed no tenderness in the lumbosacral spine, no paraspinal muscle tenderness, discomfort in the hip around the bursa with palpation and discomfort with internal rotation of the left hip. (R. at 236.) A straight leg raising test was negative. (R. at 236.) Clay was diagnosed with hip pain, hyperlipidemia, hypertension and GERD and was informed that he could use Relafen for his hip pain. (R. at 237.)

Spangler and Miller examined Clay for a second time on March 2, 2006, and completed a psychology report at the request of the Virginia Department of Rehabilitative Services. (R. at 253-58.) They concluded that due to Clay's functional illiteracy, he did not have the judgment necessary to handle his own financial affairs. (R. at 256.) Spangler and Miller administered the WAIS-III, and Clay obtained a verbal IQ score of 71, a performance IQ score of 92 and a full-scale IQ score of 79, which placed him in the borderline range of current intellectual functioning. (R. at 257.) Clay's reading achievement was assessed at the first-grade level, his arithmetic achievement was assessed at the fourth-grade level, and he was found to be functionally illiterate. (R. at 257.) Spangler and Miller diagnosed panic disorder, mild with medication and borderline intellectual functioning, and they assessed Clay's GAF score at 60. (R. at 257.)

16

Spangler and Miller also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 259-61.) They indicated that Clay had a slight impairment in his ability to understand, remember and carry out short, simple instructions and to make judgments on simple work-related decisions. (R. at 259.) Spangler and Miller also indicated that Clay had a moderate limitation in his ability to understand, remember and carry out detailed instructions, to respond appropriately to work pressures in a usual work setting, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to changes in a routine work setting. (R. at 259-60.)

Clay again presented to SMHS on April 3, 2006, with complaints of pain along his ribcage and around his stomach and high blood pressure. (R. at 265.) A musculoskeletal examination was unremarkable, and Clay was diagnosed with chest pain, hypertension and hyperlipidemia. (R. at 265.) On July 10, 2006, Looney saw Clay for epigastric discomfort. (R. at 293.) Looney noted that Clay denied chest pain, but that he had tenderness in the epigastrium with no rebound or guarding. (R. at 293.) She diagnosed epigastric discomfort, hypertension and hyperlipidemia. (R. at 293.)

Clay was seen by Dr. D'Amato on September 28, 2006, with complaints of significant epigastric pain, occasional left flank pain and occasional right upper quadrant pain. (R. at 285-87.) An abdominal examination revealed "mild to moderate-minus epigastric tenderness," no rebound, no guarding, no organomegaly and a negative Murphy's sign.[8] (R. at 287.) Dr. D'Amato diagnosed epigastric

[8]Murphy's sign is "a sign of gallbladder disease consisting of interruption of the patient's deep inspiration when the physician's fingers are pressed deeply beneath the right costal arch,

pain after meals, ruled out peptic ulcer disease and diagnosed persistent heartburn despite proton pump inhibitor therapy. (R. at 287.) He recommended that Clay undergo an upper gastrointestinal tract endoscopy. (R. at 287.) On October 11, 2006, Clay underwent an upper gastrointestinal tract endoscopy with biopsies of antrum including special stains. (R. at 282.) The procedure revealed moderate inflammation of the antrum of the stomach with multiple dot-like erosions.[9] (R. at 282-84.) On October 18, 2006, Dr. D'Amato noted that Clay was "doing somewhat better," and that a pathology report confirmed no significant abnormality of the gastric mucosa. (R. at 288.) Dr. D'Amato attributed Clay's symptoms to his taking two nonsteroidal anti-inflammatory drugs at the same time. (R. at 288.) On November 7, 2006, Looney treated Clay for high blood pressure and stomach problems. (R. at 290.) Clay reported that Protonix did not work as well as Prevacid, and he also requested a change in his arthritis medication. (R. at 290.) He was diagnosed with hypertension, hyperlipidemia and GERD. (R. at 290.) A radiology report from Abingdon Radiology Services, dated March 5, 2007, revealed a grossly normal chest. (R. at 300.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the

---

below the hepatic margin." *See* Dorland's at 1524.

    [9]An antrum is a cavity or chamber. *See* Dorland's at 107.

claimant: 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairment. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 20, 2006, the ALJ denied Clay's claims. (R. at 14-18.) The ALJ found that Clay met the disability insured status requirements of the Act for DIB purposes through the date of his decision. (R. at 17.) The ALJ found that Clay had not engaged in substantial gainful activity since his alleged onset date. (R. at 17.) The ALJ also found that the medical evidence established that Clay had severe impairments, namely diverticulosis and borderline intellect, but he found that Clay did not have an impairment or combination of impairments that

19

met or medically equaled one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ found that Clay's allegations of disabling pain and other symptoms were not credible and were not supported by the documentary evidence. (R. at 17.) The ALJ found that Clay had the residual functional capacity to perform the full range of light work. (R. at 17.) The ALJ also found that Clay did not have any nonexertional limitations. (R. at 17.) The ALJ found that Clay was unable to perform any of his past relevant work. (R. at 17.) The ALJ also found that Clay was functionally illiterate and that transferability of job skills was not material to the determination of disability. (R. at 17-18.) Based on Clay's age, education, experience and residual functional capacity and the Grids, the ALJ found that Clay was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 18.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2008).

In his brief, Clay argues that the ALJ erred by improperly determining Clay's residual functional capacity. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-13.) Clay also argues that the ALJ erred by failing to sufficiently explain his findings and rationale. (Plaintiff's Brief at 7-13.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Clay's first argument is that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 7-13.) I agree. An individual's residual functional capacity is defined as the most an individual can do despite the limitations caused by his physical and/or mental impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2008). An individual's "impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit [an individual's] ability to meet certain demands of jobs. These limitations may be exertional, non-exertional, or a combination of both." 20 C.F.R. §§

21

404.1569(a), 416.969(a) (2008). A nonexertional impairment has been defined as one that is not manifested by loss of strength or other physical abilities. *See Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).

In the ALJ's decision, he discussed Clay's WAIS-III scores, noting that "[t]hese scores are consistent with borderline intellect, which is, by definition, a severe mental impairment." (R. at 15.) The ALJ further found that Clay had severe mental limitations imposed by borderline intellect and functional illiteracy. (R. at 16.) Despite finding that Clay suffered from these severe mental impairments, he found that Clay had no nonexertional limitations.[10] (R. at 17.) The ALJ then applied the Grids to conclude that Clay was not disabled. (R. at 17-18.)

The United States Court of Appeals for the Fourth Circuit's opinion in *Grant*, 699 F.2d at 192 is instructive:

> We think it plain, however, that the ALJ violated the regulations' own terms by conclusively applying the Grid's Rules in the face of substantial evidence that Grant's exertional impairment (hemiparesis) was coupled with two nonexertional impairments (low intelligence and impaired dexterity). Although considerable evidence as to these nonexertional impairments was presented at the hearing, the ALJ made no specific findings as to whether or not they indeed exist. . . . [T]he regulations provide that the [G]rids may not be conclusively applied where nonexertional impairments exist in

---

[10] "Some examples of nonexertional limitations or restrictions include the following: (i) [] difficulty functioning because you are nervous, anxious, or depressed; (ii) [] difficulty maintaining attention or concentrating; (iii) [] difficulty understanding or remembering detailed instructions . . . ." 20 C.F.R. §§ 404.1569a(c), 416.969a(c) (2008).

tandem with exertional limitations; instead individualized consideration must be given. Because Grant came forward with substantial evidence tending to show the presence of nonexertional impairments, we hold that it was error for the ALJ not to make findings as to the existence of those impairments and instead simply to apply conclusively the [G]rid's Rules. Therefore, we must vacate the judgment of the district court with directions to remand the case to the Secretary for further proceedings, at which the Secretary is to determine whether Grant suffers nonexertional impairments in addition to his exertional impairment.

Similarly, in this case, Clay came forward with substantial evidence tending to show the presence of nonexertional impairments. Indeed, the ALJ's own opinion states that Clay's borderline intellect and functional illiteracy were severe mental impairments. The undersigned is of the opinion that it was error for the ALJ to make findings as to the existence of severe mental impairments and then later find that Clay did not have any nonexertional limitations, especially in light of those found by Spangler, Miller, Latham, Jennings and Perrott, as mentioned above. In addition, Dr. Johnson and Dr. Hays found that Clay would never be able to climb ladders, ropes or scaffolds,[11] and substantial evidence does not exist in the record to indicate the contrary. (R. at 213.) As such, the ALJ should not have applied the Grids to determine whether Clay was disabled.[12] Instead, he should have relied on

---

[11] The Regulations list difficulty climbing as an example of a nonexertional limitation. *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c) (2008).

[12] While the ALJ stated that, "[e]ven with the limitations indicated by exhibit 17F, based on the testimony of the vocational expert, the claimant could still perform" a significant number of jobs in the regional and national economies, (R. at 17), the ALJ made a formal finding that Clay had no nonexertional limitations and applied the Grids to reach the conclusion that Clay was not disabled. (R. at 17-18.) The undersigned is not persuaded that the ALJ relied on vocational expert testimony to make his final disability determination, and assuming that such is the case, his finding that Clay had no nonexertional limitations would still be in direct conflict

23

the testimony of a vocational expert to determine whether Clay retained the ability to perform specific jobs which exist in the national economy. *See Grant*, 699 F.2d at 192 (citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)).

Clay's second argument is that the ALJ erred by failing to sufficiently explain his findings and rationale. (Plaintiff's Brief at 7-13.) Again, I agree. As mentioned above, the ALJ must resolve conflicts within the evidence. *See Hays,* 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. In doing so, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls*, 596 F.2d at 1213. An ALJ may assign little or no weight to, or may reject, medical evidence, but in doing so, he must sufficiently explain his rationale, which must be supported by the record. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2008); *King*, 615 F.2d at 1020.

In this case, the ALJ failed to explain his rationale in discrediting many relevant exhibits, including both consultative examinations by Spangler and Miller, the findings of Jennings and Perrott and the findings of Latham. An ALJ may not simply disregard uncontradicted expert opinions in favor of his own opinion on a subject that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at

---

with his residual functional capacity finding.

869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).  As a result, the ALJ's determination of Clay's residual functional capacity is not supported by substantial evidence within the record.

Based on the above, I find that substantial evidence does not exist in this record to support the ALJ's finding that Clay is not disabled, and I recommend that the court deny Clay's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand this case for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Substantial evidence does not exist in the record to support the Commissioner's finding as to Clay's mental residual functional capacity; and

2.   Substantial evidence does not exist in the record to support the Commissioner's finding that Clay was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny Clay's motion for

25

summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand Clay's claims to the Commissioner for further consideration.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

26

DATED:     This 13th day of August 2008.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

27

Case 2:07-cv-00060-JPJ   Document 18   Filed 08/13/08   Page 27 of 27   Pageid#: 84